COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

                                        NO.
2-01-102-CR

 

RODNEY L. RICH                                                                 APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM
THE 396TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                   OPINION
ON REMAND

 

                                              ------------

I.  Introduction

Rodney L. Rich appeals from
his convictions for burglary of a habitation and aggravated assault with a
deadly weapon.  Appellant complains that
the trial court erred by preventing him from asking venire members during voir
dire about their views on what constitutes reasonable doubt.  The State concedes that appellant was
entitled to question prospective jurors about their concepts of reasonable
doubt but asserts that the trial court=s error in limiting the voir dire was harmless.  Because we agree that the error was harmless,
we affirm.








                                      II.  Procedural History

In our original opinion, we
concluded that the error was harmless under appellate rule 44.2(b) after
applying the test for individual voir dire examinations  set out in Anson v. State.[1]  The court of criminal appeals granted
appellant=s petition
for discretionary review and held that the Anson test is inapplicable to
cases in which voir dire is conducted in a group setting rather than
individually.[2]
Instead, the court of criminal appeals held that we should have conducted our
harm analysis in light of the factors applicable to cases involving the
erroneous admission of evidence.[3]








The court of criminal appeals
then remanded the case to this court for a rule 44.2(b) harm analysis based on
those factors, which include:  (1) voir
dire, (2) the jury instructions, (3) the character of the alleged error and how
it might be considered in connection with other evidence in the case, (4) any
testimony or physical evidence admitted for the jury=s consideration, (5) the nature of the evidence supporting the
verdict, (6) the State=s theory and
any defensive theories, (7) closing arguments, and (8) whether the State
emphasized the error.[4]  After conducting this review, we again
conclude that the trial court=s error in limiting appellant=s voir dire was harmless.

                                            III.  Analysis

Voir Dire.  During voir dire, the trial
court refused to allow defense counsel to ask the venire members, AWhat does >reasonable
doubt= mean to you?@  Although this limitation on voir dire was
improper,[5]
the State repeatedly emphasized to the venire members that the State had the
burden of proving beyond a reasonable doubt that appellant had committed the
charged offenses. The prosecutor explained:

The burden of proof as you probably heard, . . .
the burden of proof is beyond a reasonable doubt. . . .  [A]s district attorneys [we] have to prove
the charges to you beyond a reasonable doubt.

 

The burden of proof is always on us.  It never shifts to the defense.  They=re not required to bring
forward any witnesses or evidence.  They
certainly can if they want to, but they=re not required to.  So the burden of proof is always on us, and
we have to prove the case beyond a reasonable doubt. 








Likewise, defense counsel
emphasized the State=s duty to
prove its case beyond a reasonable doubt, the prosecutor=s duty Ato do
justice,@ and defense counsel=s duty Ato zealously
represent my client.@

And the reason the law is set up that way, out of
that conflict, out of the prosecutor attempting to do justice, bringing the
evidence, trying to prove the case to you beyond a reasonable doubt, and myself
zealously representing my client, putting the prosecution to the test, making
them prove their case beyond a reasonable doubt, out of that conflict is
supposed to come the truth.

 

That=s what we=re
here for.  We=re
here today to find out or being to find out what the truth is in this
particular case and what really happened on the day in question . . . . 

 

The trial court also orally
instructed the venire members:  AYou will not be getting any instructions from me as far as
specifically what reasonable doubt is. 
You will be given an instruction as to how you are to consider.@

Jury Instructions.  Later, in the court=s charge, the trial court instructed the jury as follows:  AIt is not required that the prosecution prove guilt beyond all
possible doubt; it is required that the prosecution=s proof excludes all reasonable doubt concerning the defendant=s guilt.@  The court of criminal appeals has held that
this instruction is proper.[6]








Character of the Error and
How it Might be Considered in Connection With the Evidence in the Case.  A defendant is entitled to
question venire members to determine how they would apply the State's burden of
proof because such examination seeks to discover a prospective juror=s views on an issue applicable to the case.[7]  A trial court abuses its discretion when it
denies defense counsel the right to ask prospective jurors a proper question
because it prevents the defendant from intelligently exercising his peremptory
strikes.[8]








In this case, appellant was
prevented from peremptorily striking venire members based on their individual
views of what constitutes reasonable doubt. The venire members were, however,
properly instructed several times that the State was required to prove
appellant=s guilt
beyond a reasonable doubt, and neither the Constitution nor any Texas statute
requires that a particular form of words be used in advising the jury what
reasonable doubt meansCor that
reasonable doubt be defined at all.[9]  There is no evidence that anyone who sat on
the jury was unwilling or unable to follow the reasonable doubt instruction.
Further, as we discuss below, the evidence of appellant=s guilt is overwhelming.

Nature of Evidence Supporting
Verdict, Including Testimony and Physical Evidence.  The events giving rise to the
charged offenses occurred during the early morning hours of October 29,
2000.  Appellant affirmatively states
that he Adoes not challenge the sufficiency of the evidence@ to support his convictions.[10]









Regarding the aggravated
assault charge, although appellant requested and received a jury instruction on
self-defense, he testified on his own behalf at guilt-innocence and admitted
that he had stabbed the victim, Shauna Bess. Appellant and Bess, the mother of
appellant=s four
children, gave conflicting testimony regarding who was the initial
aggressor.  Bess testified that appellant
had attacked her with a kitchen knife; appellant testified that Bess had
initially come after him with the knife and cut his hand, but he had wrestled
it away from her. 

Regardless of how the
altercation began, however, appellant admitted that he had stabbed Bess five or
six times after disarming herCout of anger, not in self-defense. 
Appellant testified that he was angry over A[e]verything she had done to me@Cthe couple=s stormy
romantic relationship and Bess=s alleged cutting of his hand with the knife before he took it from
her.  Appellant further testified that,
after stabbing Bess, he had gone outside and slashed her car tires because AI was mad.@  In addition, he acknowledged that Bess had
been terrified of him at the time. 








With regard to the burglary
charge, Bess testified that she and appellant were not living together at the
time of the offense.  Appellant did not
have a key to her home, because she had made him return his keys when he moved
out in September 2000 and then had the locks changed.  In the early morning hours before the
assault, appellant=s mother
called and said that appellant was intoxicated and was probably on his way over
to Bess=s home.  When he arrived at Bess=s home, appellant ran into her car, which was parked in the driveway,
and then walked to the front door.  When
Bess would not let him inside, appellant kicked open the door, splintering the
jamb, and went inside. About an hour later, after Bess had attempted to calm
appellant down by talking to him, the assault occurred. 

Officer Richard Devoe
testified that he had conducted a crime scene investigation at Bess=s residence immediately after the alleged offenses had occurred.  Officer Devoe testified that he had Afound some evidence . . . from the front door where it had been
broken.@  This evidence consisted of
what appeared to be a heel print on the door=s exterior near the door knob, a broken piece of the door jamb that
had been partially torn loose but was still connected to the door frame, a
broken piece of the door jamb that was lying on the porch just in front of the
front door, and the striker plate for the door knobCwith the screws still in itCthat was lying on the driveway fourteen inches to two feet from the
front door. 

Officer Devoe testified that
he photographed this damage, as well as the damage appellant caused by running
into Bess=s car and
slashing her tires.  The photographs were
admitted into evidence and published to the jury.  Officer Devoe also picked up the broken piece
of the door jamb and the striker plate and placed them into an evidence bag. 








Appellant testified
inconsistently about whether he had a key to Bess=s home at the time of the October 29 incidents, and there is evidence
that Bess did not always keep her door locked.[11]  Initially, appellant testified that he had
returned his key to Bess when he moved out of Bess=s home in September 2000. 
Later, however, he testified that he had a key on October 29 because,
after Bess had changed the locks in September, she had given him a key to the
new lock.  He further testified that,
although he was living with his mother at the time, he had spent the night at
Bess=s home a week or two before October 29. 








Appellant also testified
inconsistently concerning whether he had kicked in Bess=s front door on October 29. 
Appellant admitted running into Bess=s car in her driveway before the assault and slashing her tires
afterwards, but he initially denied kicking in the door.  Instead, he testified that any damage to Bess=s door had occurred two months earlier, in August 2000, when he had
kicked the door in because it was locked and Bess would not let him inside.[12]
According to appellant, on October 29 Bess had come out of the house while he
was still in the driveway, asked why he had run into her car, and then allowed
him to enter her home.  

On cross-examination,
however, appellant testified that he did not recall whether he had kicked in
the door before the assault and that he did not recall making the heel print on
the door.  He also testified that there A[c]ould be a possibility@ that he had kicked in the door when he entered Bess=s home the second timeCpost-assault after slashing her tiresCto get his eldest son. 








Closing Arguments.  During closing arguments, the
defense argued that the State had not proven the charged offenses beyond a
reasonable doubt.  In response, the State
directed the jury=s attention
to Bess=s testimony, appellant=s admission that he had stabbed Bess several times and had done it out
of anger rather than fear, all the physical evidence that appellant had kicked
Bess=s door in on October 29, and appellant=s equivocating testimony concerning whether, or when, he had done so. 

                                          IV. Conclusion

In summary, our review of the
record shows that, although the trial court improperly limited appellant=s voir dire, the jury was instructed repeatedly that the State had to
prove the charged offenses beyond a reasonable doubt. Although the trial court
did not give the jury any instructions regarding the definition of reasonable
doubtCexcept that it does not mean beyond all possible doubtCthe court of criminal appeals has held that the better practice is not
to define reasonable doubt for the jury.[13]  Further, there is no evidence that anyone who
sat on the jury would have been unable or unwilling to follow the court=s reasonable doubt instruction. 
Finally, appellant has affirmatively stated on appeal that he does not
challenge the sufficiency of the evidence to support his convictions, and there
is overwhelming evidence that appellant did, indeed, commit those offenses.








For all of these reasons, we
hold that the trial court=s improper
limiting of appellant=s voir dire
regarding the venire members= concepts of reasonable doubt did not, under the circumstances of this
case, affect appellant=s
substantial rights.[14]  Accordingly, we disregard the error and
overrule appellant=s issue.[15]

Having overruled appellant=s issue, we affirm the trial court=s judgments. 

 

 

JOHN CAYCE

CHIEF JUSTICE

 

PANEL
A:   CAYCE, C.J.; LIVINGSTON and WALKER,
JJ.

 

PUBLISH

 

DELIVERED: 
December 1, 2005











[1]See
Rich v. State, 114 S.W.3d 54, 57 (Tex. App.CFort
Worth 2003) (citing Anson, 959 S.W.2d 203, 204 (Tex. Crim. App. 1997), cert.
dism=d, 525
U.S. 924 (1998)).





[2]Rich
v. State, 160 S.W.3d 575, 577 (Tex. Crim. App. 2005).





[3]Id. at
577-78.





[4]Id.;
see also Sanchez v. State, 165 S.W.3d 707, 713 n.16 (Tex. Crim.
App. 2005) (citing its opinion in Rich and stating that rule 44.2(b) Ais
applicable when voir dire is conducted in a group setting and defendant is
prohibited from asking a proper question of the panel@).





[5]See Barajas
v. State, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002); Woolridge v. State,
827 S.W.2d 900, 906 (Tex. Crim. App. 1992).





[6]Woods
v. State, 152 S.W.3d 105, 115 (Tex. Crim. App. 2004), cert.
denied, 125 S. Ct. 2295 (2005).





[7]Barajas, 93
S.W.3d at 38; Woolridge, 827 S.W.2d at 906.





[8]Barajas, 93
S.W.3d at 38; Woolridge, 827 S.W.2d at 906-07; Smith v. State,
703 S.W.2d 641, 643 (Tex. Crim. App. 1985).





[9]See Paulson
v. State, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000); see also Hankins v.
State, 132 S.W.3d 380, 384 (Tex. Crim. App.) (holding that, because Geesa
instruction defining reasonable doubt is no longer required, trial court did
not abuse its discretion in refusing appellant's request to ask venire members
whether they could consider and follow it), cert. denied, 125 S. Ct. 358
(2004).





[10]The
burglary count of the indictment alleged that appellant

 

did
intentionally or knowingly, without the effective consent of Shauna Bess, the
owner thereof, enter a habitation with intent to commit aggravated assault [and
did attempt to commit or commit aggravated assault] and the defendant did use
or exhibit a deadly weapon, to-wit:  a
knife, that in the manner of its use or intended use was capable of causing
death or serious bodily injury.  

 

The
aggravated assault count of the indictment alleged that appellant

 

did intentionally or knowingly cause
bodily injury to Shauna Bess by stabbing her with a knife and the defendant did
use or exhibit a deadly weapon, to-wit: 
a knife, that in the manner of its use or intended use was capable of
causing death or serious bodily injury. 





[11]Appellant=s
ten-year-old sister Candace, who often visited Bess, testified that appellant
had taken her to Bess=s
home on the afternoon before the assault occurred.  Candace testified that Bess was not home when
they arrived, but the door was unlocked, so Candace and appellant went
inside.  Bess confirmed that she had
returned home to find Candace in her house and that Candace had said she got in
because the door was open.  Bess
testified that she had thought the door was locked when she left but that her
brother Randy, who was living with her, must have forgotten to lock it.  Doris Rich, appellant=s
mother, also testified that she and appellant had dropped Candace off at Bess=s
house and that the door had been closed but unlocked. 

 

None of this evidence, however, is inconsistent with Bess=s
testimony that she would not let appellant into her home just before the
assault occurred. Moreover, Doris confirmed that she had called Bess in the wee
hours of the morning on October 29 to say that appellant was drunk and probably
on his way to Bess=s
home.  Doris testified that she assumed
he was headed there because appellant and Doris sometimes spent the night at
Bess=s
house after they had been out late drinking. 





[12]Appellant
and Bess were still living together at that time.  Bess also testified that appellant had kicked
in the door, causing damage to the trim, in August 2000.  She further testified, however, that
appellant had replaced the damaged trim and that, except for a crack in the
wall, the damage depicted in Officer Devoe=s photographs was done on
October 29. 





[13]See
Paulson, 28 S.W.3d at 573.





[14]See Tex. R. App. P. 44.2(b).





[15]See
id.