# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00715-CR

**Brian Charles Frankenfield Jr., Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT
### NO. 05-245-K26, HONORABLE BILLY RAY STUBBLEFIELD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Brian Frankenfield appeals his conviction for the offense of aggravated robbery. *See* Tex. Penal Code Ann. § 29.03 (West 2003). Appellant entered a plea of not guilty, but the jury found him guilty and assessed his punishment at thirty years' imprisonment.

### POINTS OF ERROR

Appellant advances six unnumbered points of error. We have numbered the points in the order presented for purposes of reference and convenience. All points claim that the trial court erred or abused its discretion. First, appellant claims that the trial court prevented him from questioning the jury panel about the standard of proof in a criminal case. Second, the trial court is faulted for failing to grant the motion to suppress evidence. Third, complaint is made of the admission of "shoe print" evidence. Fourth, error is urged in the admission at the punishment hearing of an extraneous offense that occurred during the time of the trial for which the State gave

no timely notice. Fifth, an abuse of discretion is asserted because the trial court failed to conduct a separate hearing on the threshold admissibility of the above described extraneous offense. Sixth, error is alleged in the admission at the punishment hearing of an extraneous offense "that was based on a tainted identification."

## BACKGROUND

Appellant does not challenge the legal or factual sufficiency of the evidence to sustain the conviction. Briefly the facts show that Richard J. Horton, a night auditor, was working alone at the Red Roof Inn in Round Rock on the morning of April 15, 2004. About 2:00 a.m., after checking some guests into the hotel, Horton saw a white male with a bandana covering his face come through the front door, climb over the hotel counter, and reach for the cash drawer. Horton came forward. The man brandished a knife and pointed it at Horton, who felt threatened and backed away. The man took approximately two hundred dollars, crossed the counter again, and fled from the hotel. Horton stated that the man weighed approximately 150 pounds, was about 5' 9" tall, had dark hair, and wore a dark blue T-shirt and blue jeans. Horton was unable to make an identification of the man who took the money.

Stacey Kerr testified that in the early morning hours of August 15, 2004, about 1:00 a.m. or 2:00 a.m., she and a friend were driving home from a reception when they were stopped by police near the Red Roof Inn for having an expired registration sticker. After obtaining permission from the hotel attendant, Kerr parked her car at the rear of the hotel. Kerr sat on the grass in the front of the hotel while her friend walked to a nearby Shell service station to telephone for a ride. While Kerr waited, she saw a maroon or burgundy colored "Grand Am or Pontiac" drive up.

2

A black-haired man with a blue shirt and blue jeans got out and walked to the hotel door. He pulled a bandana over his face. Kerr saw the man go over the hotel counter, saw the clerk step back, and observed the man cross the counter again. Kerr then saw the man run from the hotel and get in the driver's side of the car. When shown a picture of a car, Kerr identified it as being similar to the car she had seen, particularly because the hub caps were painted the same color as the car. But she was unable to make an in-court identification of appellant.

Other evidence showed that fingerprint and boot impressions were lifted from the hotel counter by the Round Rock Police Department shortly after the robbery. The fingerprint impression matched the known print of appellant's left ring finger. The boot impressions matched the boots worn by appellant when he was arrested three days later.

Austin Police Sergeant Gilbert Cardenas testified that on the morning of August 18, 2004, he was investigating another robbery when he saw two white males in a maroon Pontiac Grand Prix in the traffic ahead of his vehicle. The Pontiac fit the description of the car used in several recent robberies and had the license number previously furnished to him by law enforcement sources. When the Pontiac pulled into a hotel parking lot and stopped, Sergeant Cardenas pulled in behind it. The officer learned from the dispatcher that the Pontiac had been reported stolen. Appellant, a passenger in the Pontiac, was arrested. Two knives and a bandana were found in the car near the passenger seat.

**JURY VOIR DIRE**

In his first point of error, appellant claims that the "trial judge erred in preventing appellant from questioning the jury panel about the standard of proof in a criminal case." The trial

court has broad discretion over the process of jury selection. *See Hankins v. State*, 132 S.W.3d 380, 384 (Tex. Crim. App. 2004); *Sells v. State*, 121 S.W.3d 748, 755-56 (Tex. Crim. App. 2003); *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002). Appellate courts leave to the trial court's discretion the propriety of a particular question and the trial court's conclusion will not be disturbed on appeal absent an abuse of discretion. *Barajas*, 93 S.W.3d at 38; *Allridge v. State*, 762 S.W.2d 146, 163 (Tex. Crim. App. 1988). A trial court's discretion is abused only when a proper question about a proper area of inquiry is prohibited. *Barajas*, 93 S.W.3d at 38. A "proper" voir dire examination question is one that seeks to discover a veniremember's views on an issue applicable or relevant to the case. *See Rhoades v. State*, 934 S.W.2d 113, 118 (Tex. Crim. App. 1996); *McCarter v. State*, 837 S.W.2d 117, 121-22 (Tex. Crim. App. 1992); *Smith v. State*, 703 S.W.2d 641, 643 (Tex. Crim. App. 1985).[1]

A voir dire question may be proper and relevant to an issue in a criminal case where it seeks to uncover grounds for a challenge for cause or for the purpose of intelligently exercising peremptory challenges. *Barajas*, 93 S.W.3d at 39. Further, a defendant is normally entitled to question a veniremember on voir dire examination to determine how they would apply the State's burden of proof in a criminal case (beyond a reasonable doubt) because such an examination seeks to discover a veniremember's views on an issue applicable to the case. *See id*. at 38;

---

[1] An otherwise proper question is impermissible if it attempts to commit the veniremember to a particular verdict based on particular facts. *Standefer v. State*, 59 S.W.3d 177, 181 (Tex. Crim. App. 2001). Further, a voir dire question that is vague and broad in nature is not proper and may be prevented by the trial court. *Barajas v. State*, 93 S.W.3d 36, 39 (Tex. Crim. App. 2002) (citing *Smith v. State*, 703 S.W.2d 641, 645 (Tex. Crim. App. 1985)).

*Woolridge v. State*, 827 S.W.2d 900, 906 (Tex. Crim. App. 1992); *Rich v. State*, 183 S.W.3d 473, 476 (Tex. App.—Fort Worth 2005, pet. ref'd).

In *Jones v. State*, 223 S.W.3d 379 (Tex. Crim. App. 2007), the court held that a defendant's state constitutional right to be heard by himself or by counsel, under article I, section 10 of the Texas Constitution, requires permitting a proper question that defense counsel wishes to ask a veniremember on voir dire examination, and the denial of that right is a state constitutional violation. *Id*. at 382-83.[2]

A trial court's impermissible exclusion of a proper question during jury voir dire examination is subject to a harm analysis. *Rich v. State*, 160 S.W.3d 575, 577 (Tex. Crim. App. 2005); *Gonzales v. State*, 994 S.W.2d 170, 171 (Tex. Crim. App. 1999); *Cena v. State*, 991 S.W.2d 283, 283 (Tex. Crim. App. 1999).

Here, at the commencement of voir dire, the trial court instructed the jury that the State had the burden of proving its case beyond a reasonable doubt, a term that the court explained is not defined by law. The prosecutor began his interrogation by addressing the jury panel as a whole and then asking questions of individual veniremembers. Appellant's counsel began her voir dire examination in the same manner.

To support his contention, appellant directs our attention to only one portion of the voir dire record:

---

[2] In *Jones v. State*, 223 S.W.2d 379 (Tex. Crim. App. 2007), the Court did not discuss the Texas cases holding that essential to the Sixth Amendment guarantees of the assistance of counsel and trial before an impartial jury "is the right to question veniremembers in order to intelligently exercise peremptory challenges or challenges for cause." *See, i.e.*, *Franklin v. State*, 138 S.W.3d 351, 354 (Tex. Crim. App. 2004). *Jones* was based solely on the Texas Constitution.

5

Ms. Gauthier: [Defense Counsel]: . . . There has been--as the Judge instructed you, in Texas there is no legal, snappy way for us to tell you what "beyond a reasonable doubt" is. And, in fact, you come to the jury box with your own feelings of what "beyond a reasonable doubt" is.

Juror number 18, number 18, [Clark]: What would be a definition of "beyond a reasonable doubt" for you?

Mr. McCabe: [prosecutor]: I object. There's not a legal definition and they'll be given no legal definition for the purposes of this case.

The Court: You want to respond?

Ms. Gauthier: [Defense Counsel]: I'm asking--my response would be I was just asking the opinion on something.

The Court: Because there is no legal definition of a reasonable doubt, I've instructed them that they would have to use their own judgment as to what a doubt would be that was reasonable. I think we better stay away from individual juror's–

Ms. Gauthier: [Defense Counsel]: Okay.

The Court: --opinions.

Ms. Gauthier: [Defense Counsel]: All right.

This record shows that the question was directed solely to veniremember no. 18. The trial court did not rule upon the State's objection but made a suggestion in which appellant's counsel acquiesced. The matter was not pursued, at least with veniremember no. 18. Appellant did not object and no bill of exception was perfected. *See* Tex. R. Evid. 103(a)(2)(b).

At no time did appellant inform the trial court that it was improperly restricting his right to pose a proper voir dire question to venireman no. 18, or to the entire jury panel, and that such restriction was a violation of his constitutional right or rights. In order for an issue to be preserved for review, there must be a timely objection which specifically states the legal basis for the objection

6

and an adverse ruling must be obtained. Tex. R. App. P. 33.1(a)(1)(A); *Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990); *Zillender v. State*, 557 S.W.2d 515, 517 (Tex. Crim. App. 1977). Appellant did not preserve any error in the interrogation of venireman no. 18 and, in fact, waived error as to the only voir dire examination complained of on appeal. Even constitutional error may be waived by failure to object. *Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000); *Henson v. State*, 173 S.W.3d 92, 99 (Tex. App.—Tyler 2005, pet. ref'd).

Moreover, the record reflects that appellant's counsel on voir dire examination discussed with the veniremembers the burdens of proof of "by a preponderance of the evidence," "clear and convincing evidence," and "beyond a reasonable doubt." As to this later standard, counsel added: "And as the Judge said, that has not been legally defined, but I think if you put it in perspective with the other two, that you can see what kind of level of doubt, what kind of proof that the State is supposed to get." Immediately thereafter, the appellant's counsel asked veniremember no. 19 [Keith], ". . . do you have any thoughts about that?" After veniremember no. 19 concluded his remarks, counsel moved to veniremember no. 13 [Bokman]:

> [Defense counsel]: . . . Mr. Number 13, do you have an opinion on "beyond a reasonable doubt?" Have you thought about that before?
>
> Mr. Bokman: About what it means?
>
> [Defense counsel]: Yeah.

Thereafter, veniremember no. 13 tried to explain "beyond a reasonable doubt." He agreed with appellant's counsel that the burden of proof remained with the State and that if the State failed to

7

prove an element of the charged offense, there would be a reasonable doubt. The discussion soon moved on to eyewitness testimony.

Later, in fact, appellant's counsel asked the jury panel if there were any questions not asked that they hoped would be asked and answered. This generated, without objection, a discussion and further interrogation in which the burden of proof was involved. A hypothetical question was posed about the State alleging a barbell as a weapon and proving a bat. Statements by the veniremember showed that if the State failed to prove an element of the offense, there would be reasonable doubt and that an acquittal would be proper.

In its jury charge, the trial court properly instructed the jury on the burden of proof "beyond a reasonable doubt" and the attorneys for the parties discussed that burden in their jury arguments.

We do not find, as the point of error indicates, that appellant was restricted in addressing a burden-of-proof question to the jury panel as a whole. The only complained-of incident related to veniremember no. 18.[3] The error there, if any, was not preserved for appeal and was waived. There is no need for a harm analysis. *See* Tex. R. App. P. 44.2(a). The first point of error is overruled.

---

[3] We observe that veniremember no. 18 did not serve on the jury as the State exercised a peremptory challenge against him. Earlier cases have held that where this occurs, the defense has no right to complain of limited questioning of that particular veniremember. *Allridge v. State*, 762 S.W.2d 146, 168 (Tex. Crim. App. 1988); *see also Dinkins v. State*, 894 S.W.2d 330, 345 (Tex. Crim. App. 1995).

## MOTION TO SUPPRESS EVIDENCE

In the second point of error, appellant urges that the "trial court erred in failing to grant appellant's motion to suppress the physical evidence."

Generally, we review a trial court's ruling on a motion to suppress for an abuse of discretion. *Dyar v. State*, 125 S.W.3d 460, 462 (Tex. Crim. App. 2003); *Villareal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). In doing so, we apply a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We must afford almost total deference to the trial court's determination of historical facts supported by the record as well as application-of-law-to-fact questions that turn on evaluation of credibility and demeanor. *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002). We do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). The trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999).

When, however, the trial court's rulings do not turn on the credibility of the witnesses, we review de novo those rulings on mixed questions of law and fact. *Johnson*, 68 S.W.3d at 652. We generally review de novo the trial court's application of the law to the facts. *Ross*, 32 S.W.3d at 856; *Carmouche*, 10 S.W.3d at 327; *Romero*, 800 S.W.2d at 543. A reviewing court is not required to give deference to the legal ruling of the trial court and is not bound by it. *See Serrano v. State*, 123 S.W.3d 53, 58 (Tex. App.—Austin 2003, pet. ref'd). The trial court's legal ruling, however, will be upheld if it is correct on any theory of the law applicable to the case, even if the

9

trial court gives the wrong reason therefor. *State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002); *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002); *Romero*, 800 S.W.2d at 543.

When, as here, the trial court makes no findings of fact and conclusions of law, and none are requested,[4] we review the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling so long as those findings are supported by the record. *Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007); *Ross*, 32 S.W.3d at 855; *Carmouche*, 10 S.W.3d at 328.

The record reflects that all of the witnesses at the suppression hearing were State's witnesses. On the morning of August 18, 2004, Austin Police Sergeant Gilbert Cardenas, of the Criminal Intelligence Unit, was investigating a series of recent robberies in north Austin. He had learned from a law enforcement bulletin that a white male in a maroon vehicle with license plate number 13779 had been seen at the site of several of the robberies. Sergeant Cardenas had talked that morning with Nona Goodwin, an employee of the Dunkin' Donuts shop on Research Boulevard, who had been a victim of a robbery at the shop the night before on August 17, 2004. There had been an earlier robbery there on August 9, 2004. Goodwin gave him a description of the suspect and the car, noting that the suspect had tattoos but had been wearing a black or dark bandana over his face. It appeared that the modus operandi was the same in both robberies at the Dunkin' Donuts shop.

Later that morning on his way to the Dunkin' Donuts shop, Sergeant Cardenas, dressed in mufti and driving an unmarked police car, saw a maroon Pontiac Grand Prix containing two white males. The vehicle bore Montana license number 13779. The car pulled into the parking

---

[4] *Cf. Cullen v. State*, 195 S.W.3d 696 (Tex. Crim. App. 2000).

10

lot of Studio 6 Motel near the Dunkin' Donuts shop. Some of the recent robberies had occurred at motels and two robberies had taken place at the nearby Dunkin' Donuts shop. Sergeant Cardenas observed that the Pontiac parked irregularly in the parking lot and he pulled his vehicle in behind the Pontiac.

Sergeant Cardenas alerted the dispatcher, requesting backup units. The dispatcher informed him that the vehicle had been reported stolen. The passenger, later identified as appellant, got out of the Pontiac. He fit the description of the suspect in the robberies and had a visible tattoo. Sergeant Cardenas ordered appellant back into the Pontiac. Sergeant Cardenas got out of his vehicle with his gun drawn.

Backup police officers arrived on the scene, and with Cardenas, ordered the two occupants out of the Pontiac. Appellant was removed from the passenger seat, handcuffed, and placed in a police vehicle. It was observed that appellant had many tattoos on his body, including his neck.

Officer Troy Reeves arrived on the scene within a few minutes after he was alerted by the dispatcher. He and Officer Michelleti were the backup officers. They arrived before the driver and passenger were ordered out of the Pontiac. Officer Reeves took custody of appellant and placed him in Reeves's police vehicle. Officer Reeves testified that he recognized appellant from having seen the videotape of the robbery at Crossland Suites located in the City of Austin, in Williamson County, on August 13, 2004. The officer had also seen the still photographs from that video. Officer Reeves reported that appellant, at the time of his arrest, was still wearing the same

11

clothes as shown on the videotape, a black and orange shirt, blue jeans, and work boots with paint marks and different colored shoe laces.

The driver, Charles Bennatt, was arrested on an outstanding warrant. The Pontiac was inventoried per Austin Police Department policy. James Bush, an Austin Police Crime Scene Specialist, inventoried the car. A black and white bandana was found in the passenger side door pocket. A black folding knife was found in the passenger seat, and a second knife with a serrated edge was found on the rear floorboard. All items were within appellant's reach while he was a passenger in the Pontiac.

Following instructions, Officer Reeves took appellant to the Austin jail where appellant was interviewed by Detective Andrew Perkel. Later, Detective Perkel instructed Officer Reeves to transport appellant to the Williamson County jail where he was formally charged with the robbery at the Crossland Suites. At the jail, appellant was placed in jail garb and his clothes and boots were taken from him.

Appellant offered no evidence at the suppression hearing but offered argument along with the State. The trial court overruled the motion to suppress, saying the hearing was "replete with exigent circumstances." Appellant did not request findings of fact and conclusions of law, and none were made by the trial court.

At the suppression hearing, appellant complained of the improper search and seizure of the items that were found in the maroon Pontiac and the seizure of his clothes and boots. This is probably what he describes in his point of error as "physical evidence," although these items are not mentioned in his brief. Appellant asserts that there was no reasonable suspicion as a basis for

lawful detention and no probable cause for his warrantless arrest. He recites some of the facts of the suppression hearing and complains of the trial court's use of the term "exigent circumstances" as having no basis in the testimony of the police officers. Questions of probable cause and reasonable suspicion are reviewed de novo. *Wiede*, 214 S.W.3d at 24-25; *Franks v. State*, 241 S.W.3d 135, 140-41 (Tex. App.—Austin 2007, pet. ref'd).

## THREE CATEGORIES OF INTERACTIONS

Both the Fourth Amendment to the United States Constitution and article I, section 9 of the Texas Constitution protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tex. Const. art. I, § 9. Appellant here makes no claim that the Texas constitutional provision affords him greater protection than its federal constitutional counterpart. Therefore, we treat them jointly as providing the same protection. *See Johnson v. State*, 912 S.W.2d 227, 233-34 (Tex. Crim. App. 1995).

The Texas Court of Criminal Appeals has recognized the following three categories of interactions between police officers and citizens: (1) encounters, (2) investigative detentions, and (3) arrests. *State v. Perez*, 85 S.W.3d 817, 819 (Tex. Crim. App. 2002); *Francis v. State*, 922 S.W.2d 176, 178 (Tex. Crim. App. 1996); *State v. Bryant*, 161 S.W.3d 758, 761 (Tex. App.—Fort Worth 2005, no pet.).[5]

For an arrest to be justified under the Fourth Amendment, it must be accompanied by probable cause to believe that a person has engaged in or is engaging in criminal activity. *See*

---

[5] We are not concerned with "encounters" under the facts and circumstances of this case.

13

*Henry v. United States*, 361 U.S. 98, 102 (1959). A person is arrested when his liberty of movement is restricted or restrained by an officer or by a person executing a warrant of arrest or arresting without a warrant. Tex. Code Crim. Proc. Ann. art. 15.22 (West 2005); *Medford v. State*, 13 S.W.3d 769, 772-73 (Tex. Crim. App. 2000). The constitution is invoked only when the "encounter" rises to the level of the seizure of a person. *McCraw v. State*, 117 S.W.3d 47, 51 (Tex. App.—Fort Worth 2003, pet. ref'd). Both arrests and temporary investigative detentions involve seizures without a bright-line distinction between them. *Josey v. State*, 981 S.W.2d 831, 839 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd). Sometimes the distinction is a matter of degree and involves different factors. *McCraw*, 117 S.W.3d at 52.

A detention may be justified on circumstances less than probable cause. *Garza v. State*, 771 S.W.2d 549, 558 (Tex. Crim. App. 1989); *Bryant*, 161 S.W.3d at 760. A stop is deemed an investigative detention when a law enforcement officer detains a person reasonably suspected of criminal activity to determine the person's identity or to momentarily maintain the status quo to garner more information. *See Hoag v. State*, 728 S.W.2d 375, 380 (Tex. Crim. App. 1987). A temporary detention is justified when the detaining officer has specific, articulable facts which, taken together with rational inferences from other facts, lead him to conclude the person detained is, has been, or soon will be engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005); *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). The facts must amount to more than a mere hunch or suspicion. *Davis v. State*, 947 S.W.2d 240, 244 (Tex. Crim. App. 1997). An investigative detention occurs when an individual is confronted by a police officer, yields to the officer's display of authority, and

14

is temporarily detained for the purpose of investigation. *Johnson*, 912 S.W.2d at 235. Whether reasonable suspicion exists is determined by considering the facts known to the officer at the time of the detention. *Terry*, 392 U.S. at 21-22; *Franks*, 241 S.W.3d at 141. A reasonable suspicion determination is made by considering the totality of the circumstances. *Ford*, 158 S.W.3d at 492-93. An investigative detention must last no longer than necessary to effectuate the purpose of the stop and must involve actual investigation. *Akins v. State*, 202 S.W.3d 879, 885 (Tex. App.—Fort Worth 2006, pet. ref'd).

The question here is whether Sergeant Cardenas had specific articulable facts, with reasonable inference from other facts, that led him to conclude that the person he detained was, has been, or soon would be engaged in criminal activity. We agree that he had the necessary reasonable suspicion to legally detain appellant. We need not repeat all the facts. On the morning of August 18, 2004, Sergeant Cardenas was driving to the location of Dunkin' Donuts where a second robbery had occurred on the night of August 17, 2004. Cardenas had earlier talked by telephone with Nona Goodwin, the victim of that robbery. Sergeant Cardenas knew of eight or nine unsolved aggravated robberies that had occurred at businesses earlier in August, including motels. The modus operandi in these robberies appeared to be the same. Sergeant Cardenas knew that the suspect was a white male who had used a maroon car with license no. 13779. He had obtained descriptions of the suspect and the car from Goodwin earlier that morning. After encountering two white males in the maroon car in traffic, as described, Sergeant Cardenas pulled in behind the car after it parked in a motel parking lot. It was then that he learned the maroon car was stolen, and Officer Reeves arrived and identified appellant as being the suspect in another robbery.

15

Under the totality of all the circumstances, Sergeant Cardenas had the duty to make an investigative detention of appellant, who was reasonably suspected of criminal activity, to determine appellant's identity and momentarily maintain the status quo to gather more information. The proper detention ripened into probable cause when Sergeant Cardenas learned that the car was stolen and learned from Officer Reeves that appellant had committed an earlier robbery at the Crossland Suites. Having received information from the police dispatcher and Officer Reeves, both credible persons, that felonies had been committed, with appellant still being in a motor vehicle,[6] and there being no time to procure a warrant, Sergeant Cardenas had the right to make a warrantless arrest under article 14.04. *See* Tex. Code Crim. Proc. Ann. art. 14.04 (West 2005).

We find no abuse of discretion in the trial court's overruling of the suppression motion. If the ruling is reasonably supported by the record and is correct under any theory of the law applicable to the case, the ruling will be upheld. *Steelman*, 93 S.W.3d at 107.

Moreover, appellant lacked standing to contest the validity of the search of the Pontiac. An accused has standing to contest a search under the Fourth Amendment only if he had a legitimate expectation of privacy in the place that the government official invaded. *Granados v. State*, 85 S.W.3d 217, 222-23 (Tex. Crim. App. 2002) (citing *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). A defendant has the burden of demonstrating his legitimate expectation of privacy.

---

[6] The record shows that the maroon Pontiac parked in the motel parking lot of the driver's own accord. The record does not reflect that it was blocked by Sergeant Cardenas's action.

*Id.* He can do so by establishing that he has a subjective expectation of privacy in the place invaded that society is prepared to recognize as reasonable. *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).[7] The occupant of a stolen motor vehicle does not have a reasonable expectation of privacy in the vehicle. *Hughes v. State*, 897 S.W.2d 285, 305 (Tex. Crim. App. 1994); *Jackson v. State*, 745 S.W.2d 4, 8 (Tex. Crim. App.) *cert. denied*, 487 U.S. 1241 (1988); *Viduarri v. State*, 626 S.W.2d 749, 750 (Tex. Crim. App. 1981). Appellant assumed no burden of demonstrating this legitimate expectation of privacy in the Pontiac or showing that it was not stolen. Any expectation of privacy that appellant might claim in a stolen vehicle would not be "one that society is prepared to recognize as reasonable." *Smith*, 442 U.S. at 740. The State raised the issue of standing during the suppression hearing, but such issue may be raised for the first time on appeal. *State v. Klima*, 934 S.W.2d 109, 111 (Tex. Crim. App. 1996). Appellant had no standing to contest the validity of the search or inventory of the Pontiac in which two knives and a black and white bandana were found. These are items that appellant claims should have been suppressed. There is no merit to the claim.

Appellant's clothes and boots were taken from him at the Williamson County jail after formal robbery charges had been filed and he was being incarcerated and given jail garb. In *Illinois v. Lafayette*, 462 U.S. 640 (1983), the United States Supreme Court distinguished the right to search incident to arrest from a different right to search incident to incarcerating an arrestee at the jail station house. Incarceration is a requirement of this latter right. *Lafayette*, 462 U.S. at 648 n.3.

---

[7] While standing is not a precondition to testing the validity of a search or seizure, a defendant contesting such police action should include allegations of standing in his motion to suppress evidence. *Edwards v. State*, 850 S.W.2d 731, 734 n.6 (Tex. App.—El Paso 1993, no pet.).

17

It would apparently permit a more intrusive search than permissible to a search incident to the arrest. A defendant's clothing could probably not be taken from him at the time and place of his arrest, but such police action would be permissible as part of a preincarceration search. *Id.* at 645; 40 George E. Dix & Robert O. Dawson, Texas Practice: *Criminal Practice and Procedure*, § 11.31 (2d ed. West 2001); *see also Rogers v. State*, 774 S.W.2d 247, 264 (Tex. Crim. App. 1989); *Gonzales v. State*, 990 S.W.2d 833, 835 (Tex. App.—El Paso 1999, pet. ref'd). Appellant's clothes and boots were properly seized under the circumstances. The second point of error is overruled.

### SHOE PRINT EVIDENCE

In his third point of error, appellant contends that the "trial court erred in allowing the admission of shoe print evidence that was not shown to be sufficiently reliable in either collection or analysis." Appellant questions the admission of the testimony of Melissa Valdez, a forensic crime lab technician for the Texas Department of Public Safety (D.P.S.), as an expert in shoe print impressions. He cites Rule 702 of the Texas Rules of Evidence which governs the admissibility of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Tex. R. Evid. 702.

The proponent of an expert's testimony bears the burden of proof under Rule 702. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996); *Perez v. State*, 113 S.W.3d 819, 832

18

(Tex. App.—Austin 2003, pet. ref'd); *Roise v. State*, 7 S.W.3d 225, 233 (Tex. App.—Austin 1999, pet. ref'd).[8] Before admitting the expert testimony under Rule 702, the trial court must be satisfied that three conditions are met: (1) the witness qualifies as an expert by reason of her knowledge, skill, experience, training, or education, (2) the subject matter of the testimony is an appropriate one for expert testimony, and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006); *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006); *Alvarado v. State*, 912 S.W.2d 199, 215-16 (Tex. Crim. App. 1995). These inquiries or conditions are commonly referred to as (1) qualifications, (2) reliability, and (3) relevance. *Vela*, 209 S.W.3d at 131.

## QUALIFICATION INQUIRY

No rigid formula exists for determining whether a particular witness is qualified to testify as an expert. *Malone v. State*, 163 S.W.3d 785, 793 (Tex. App.—Texarkana 2005, pet. ref'd) (citing *Alvarado*, 912 S.W.2d at 215-16). The inquiry is "a flexible one." *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993). The expertise must be measured against the particular opinion that the expert is offering. *Roise*, 7 S.W.3d at 234. A college or university degree alone is not enough to qualify a purported expert to give an opinion, as the case may be, on every conceivable medical, legal, or psychological question. *Id*. There must be a "fit" between the subject matter at issue and the expert's familiarity therewith. *Id*. (citing *Broders*, 924 S.W.3d at

---

[8] The proponent must prove by clear and convincing proof that the expert's testimony is trustworthy. *See Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992); *see also Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993).

153). The proponent must establish that the expert has knowledge, skill, experience, training, or education regarding the specific issue which would qualify the expert to give an opinion on that particular subject. *Id.* Qualification is distinct from reliability and relevance and thus, should be evaluated independently. *Vela*, 209 S.W.3d at 131.

## RELIABILITY INQUIRY

The proponent of scientific evidence must show, by clear and convincing proof, that the evidence is sufficiently reliable and relevant to assist the jury in understanding other evidence or in determining a fact issue in the case. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Malone*, 163 S.W.3d at 793.

In *Nenno v. State*, 970 S.W.2d 549, 560-61 (Tex. Crim. App. 1998), *overruled on other grounds*, *State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999), the Texas Court of Criminal Appeals tailored a translation of the test in *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) for experts outside the hard or novel sciences. *See also Roise*, 7 S.W.3d at 235. When the expert is from a discipline which involves technical or specialized knowledge, experience, and training as opposed to the scientific method, the test for reliability for "soft" sciences is (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of the field, and (3) whether the expert's testimony properly relies on and/or utilizes the principles involved in the fileld. *Nenno*, 970 S.W.2d at 561; *Roise*, 7 S.W.3d at 235; *see also Weatherred*, 15 S.W.3d at 542.

20

## RELEVANCY INQUIRY

In making the initial determination of admissibility of evidence, Texas courts must apply the principles set forth in the evidence rules governing relevancy. *Roise*, 7 S.W.3d at 233 (citing Tex. R. Evid. 401-03). When the offered evidence is the testimony of expert witnesses, the court must apply the principles set forth in the rules governing expert witnesses. *Id*. (citing Tex. R. Evid. 702-05). To meet the relevancy test, the proffered evidence must first have probative value, and second, the proposition must be of consequence to some issue in the trial. *Id*. (citing Tex. R. Evid. 401). "Relevance is established by determining whether the expert testimony relates to a fact in the case. The question of relevance is the 'Does it fit?' question." *Jordan v. State*, 928 S.W.2d 550, 557 (Tex. Crim. App. 1996) (Keller, J., dissenting). To be relevant, expert testimony must relate to the pertinent facts of the case. *Morales v. State*, 32 S.W.3d 862, 865 (Tex. Crim. App. 2000); *Jordan*, 928 S.W.2d at 555. "It must be sufficiently tied to the facts to meet the simple requirement that it be 'helpful' to the jury." *Morales*, 32 S.W.3d at 865 (quoting *Jordan*, 928 S.W.2d at 555). Moreover,

> [r]elevance is by nature a looser notion than reliability. Whether evidence "will assist the trier of fact" and is sufficiently tied to the facts of the case is a simpler, more straight-forward matter to establish than whether the evidence is sufficiently grounded in science to be reliable. This is not to say that the relevancy inquiry will always be satisfied.

*Jordan*, 928 S.W.2d at 555. Although relevant, a trial court may nevertheless exclude evidence provided by expert testimony if its probative value is substantially out-weighed by the danger of one of the factors set forth in Rule 403. Tex. R. Evid. 403.

21

## STANDARD OF REVIEW

The decision of a trial court to admit expert testimony is reviewed for an abuse of discretion. *Alvarado*, 912 S.W.2d at 216. The test for determining whether an abuse of discretion occurred is whether the trial court acted without reference to any guiding rules and principles or acted in an arbitrary and unreasonable manner. *Roise*, 7 S.W.3d at 233. Because the possible spectrum of education, skill, and training of a purported expert witness is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case. *Rodgers*, 205 S.W.3d at 527-28. Absent a clear abuse of discretion, the trial court's decision to admit or exclude expert testimony will not normally be disturbed. *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000).

## THE INSTANT CASE

On August 15, 2004, after the robbery at the Red Roof Inn, Kerie Taylor, a crime scene specialist with the Round Rock Police Department, lifted two boot or shoe impressions or prints from the top of the counter in the lobby of the hotel. She also lifted a fingerprint from the counter that was shown to be identical to appellant's known left ring finger. In lifting the boot impressions, Taylor used six cards to lift the two impressions, three for each boot print.

The lifted impressions and the boots taken from appellant subsequent to his arrest were submitted to the D.P.S. Crime Laboratory. Melissa Valdez, a forensic scientist with the laboratory, compared the boot impressions with appellant's boots.

Prior to Valdez's testimony before the jury, the trial court conducted a Rule 702 hearing, in the absence of the jury, which the trial court called a "*Daubert-Kelly*" hearing.[8] At the hearing, Valdez testified that she had been a forensic scientist with the D.P.S. for three and a half years studying, examining, analyzing, and comparing items such as hair, paints, fiber, shoe, and tire impressions. She had a bachelor of science degree in chemistry from Texas A&M University and a master of science degree from the University of Alabama at Birmingham. Valdez testified as to her initial nine month extensive training at the D.P.S. in analyzing and comparing items including shoe impressions, a week-long course on shoe impressions by William Bodziak, recognized by both parties as a "nationally known authority" in the discipline of shoe impressions.[9] Valdez had additional on-the-job training under the supervision of Juan Rojas, an experienced shoe-impression analyst for twenty-four years. Valdez related that her training in shoe impressions covered the enhancement process, chemical enhancement processes, photography techniques for collecting "question" impressions at crime scenes, comparison techniques, the scientific theory behind shoe impressions, and the differences between class characteristics and individual or unique characteristics of shoes.

Valdez explained the analysis involved in taking a lifted shoe impression and comparing that impression to a known shoe submitted to the laboratory. The results of her analysis and comparisons were routinely reviewed by an experienced shoe-impression analyst at the D.P.S.

---

[8] *See Daubert*, 509 U.S. at 592; *Kelly*, 824 S.W.2d at 569 & n.3.

[9] Appellant's counsel, on voir dire examination, had Valdez read passages from the second edition of William J. Bodziak's book: "Footwear Impression Evidence, Detection, Recovery, and Examination."

23

Valdez stated that class characteristics of a shoe means the size of the shoe, tread pattern or design placed on the bottom of the shoe, and characteristics from the shoe's manufacturers. Individual characteristics, she explained, were additions, deletions, and defects caused by accident or frequently by the way the shoe is worn. She explained that different people wear shoes in different ways resulting in individual or unique characteristics. Valdez testified that she analyzed and compared the boot impressions lifted by Taylor (State's exhibits 20 and 21) with State's exhibit 5, the boots taken from appellant. She acknowledged that the impressions were lifted by a tape used to lift fingerprints and while that may not be the best method of preserving a shoe impression, the ones collected by Taylor were accurate replications of the boot impressions left on the hotel's counter.

Valdez testified that exhibit 20 was made by appellant's left boot and exhibit 21 was made by appellant's right boot. She based her conclusions on the comparison of the class and individual characteristics of each boot and the corresponding "question" impression. Valdez noted that appellant's right boot was missing a circular portion on the underside of the heel but the corresponding "question" impression, State's exhibit 21, contained the impression of the missing circular feature. Valdez theorized that the missing circular feature could have been removed or deleted between the time of the robbery at the hotel and the recovery of appellant's boot, which was about three days. The alteration could have resulted from an accident or otherwise. There were other and sufficient individual characteristics of appellant's right boot which corresponded with the features of exhibit 21 to permit a positive identification.

At the conclusion of the Rule 702 hearing and over objection, the trial court found, in effect, that Valdez was a qualified expert witness in the recognized field of latent shoe-impression

24

analysis, and that her testimony was sufficiently reliable and relevant to aid the jury on the task at hand. Having found the evidence relevant, the trial court further conducted a Rule 403 hearing and concluded that the relevant evidence and its probative value were not substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403.

On appeal, appellant's point of error simply states that the shoe print evidence is not sufficiently reliable in collection and analysis. It appears that appellant is limiting his appellate complaint to the reliability factor. From his running discussion, however, it is difficult to pinpoint whether appellant is also challenging the expert's qualifications or questioning the relevancy factor. Some statements in the brief make reference to a page in the record but lack citation to authority or further discussion. *See* Tex. R. App. P. 38.1(h).

Appellant does challenge the collection of the shoe-print evidence. As noted, the collection was by Keri Taylor, a crime-scene specialist, not by Melissa Valdez. Taylor used black powder on the hotel counter and lifted the impressions with tape used for lifting fingerprints. She placed each boot print on three separate fingerprint cards. Taylor used the material available at the crime scene. Valdez, who had been trained in collection, testified that the method used was not the best method of preserving a shoe impression but was still a viable method and that the boot impressions collected by Taylor in this case were accurate replications of the boot impressions on the hotel counter. There was evidence that there were other preferred methods of lifting shoe prints and that loss or damage to the impressions were possible with the method used here. Appellant did not establish that the collection method used rendered Valdez's testimony unreliable. The fact

that the method used was not the most preferred method goes to the weight of the evidence and not to its admissibility.

In an apparent challenge to Valdez's analysis, appellant mentions the testimony about the matching characteristics between appellant's known boots and the impressions. He calls attention to the missing circular rubber portion on the known right boot heel which was still in place as reflected by the right foot impression and which corresponded to the same pattern on the left boot heel. In her testimony, Valdez explained this possible discrepancy. Appellant asserts that Valdez could not determine the size of the boots from the boot impressions alone. Valdez did so testify but other than making the above assertion, appellant has not briefed the matter. Further, we do not find an objection to this matter as a reliability factor. The failure to determine the size of the boot from the impressions goes to the weight of the evidence and not its admissibility.

In passing, we note that appellant has complained about Valdez's certainty of the match between the boots and the boot impressions because she was testifying for the first time about shoe impressions. Valdez testified that in her three-and-a-half years with the D.P.S., she had testified seven times, but that this was her first time to testify about a shoe impression. A complaint on appeal must comport with a trial objection. *See Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990). There was no trial objection to preserve error on this basis. Tex. R. App. P. 33.1(a)(1)(A). Further, appellant presents no argument or authorities to support his rather novel challenge to Valdez's qualifications as an expert witness. Under appellant's theory, no one could qualify as an expert witness unless they had testified previously. Many highly-regarded experts and recognized authors in a field of science choose not to testify in court as witnesses. This does

26

not diminish their standing as experts in a particular field or discipline.[10] There is no merit to appellant's contention. The jury was made aware of this matter, which goes to the weight and not the admissibility of Valdez's testimony.

We do not find under this point of error that appellant has challenged the relevancy of Valdez's expert testimony. The expert testimony went to the identification of the person who committed the robbery at the Red Roof Inn, an issue for the jury to decide and the trial court concluded that the testimony would be an aid to the jury in its deliberations.

On appeal, appellant does not challenge the validity of the field of science or discipline of latent shoe-impression analysis. Valdez testified, without dispute, about its validity and acceptance within the scientific community. Both parties recognized William Bodziak as an authority in this field or discipline. In *Rodgers*, 205 S.W.3d at 532, the Texas Court of Criminal Appeals wrote:

> This type of testimony has long been admissible in Texas and elsewhere, by *either* lay or expert witnesses. Decades ago, we noted that shoe print impression in testimony is generally admissible.

(citations omitted).

In admitting Valdez's expert testimony, the trial court did not abuse its discretion. The third point of error is overruled.

---

[10] In *Hurrelbrink v. State*, 46 S.W.3d 350, 353-54 (Tex. App.—Amarillo 2001, pet. ref'd), Dr. Alexander Sonek, a professor of anthropology at San Diego State University was shown to be a recognized expert in the field of footprint comparison, and he was testifying for the first time in that case as an expert witness in that field.

**EXTRANEOUS OFFENSE**

In his fourth point of error, appellant contends that the "trial court abused its discretion when it allowed the admission of an extraneous offense that occurred during the trial of this case and for which the state gave no notice."

Trial commenced on September 26, 2005. On the third day of the punishment hearing, October 4, 2005, it came to the attention of the parties and the trial court that an incident had occurred during the lunchtime recess at the Williamson County jail involving appellant and some deputy sheriffs. In court that afternoon, approximately four hours after the incident, the prosecutor gave oral notice to appellant, his counsel, and the trial court that the State intended to offer the jail incident, which involved appellant's assault upon a public servant, Deputy Richard Stammitz, as an extraneous offense. The prosecutor stated that he was giving notice of the State's intention as soon as he could, noting that the incident occurred at lunchtime that day.

Appellant's counsel moved for a continuance and a chance to investigate the jail incident. The prosecutor wanted the jury to see the current condition of Stammitz's eye or facial injury and rejected the suggestion of using photographs of Stammitz's injury. After a lengthy colloquy at the bench, the trial court announced that it would permit the State to proceed with the direct examination of Stammitz before the jury and would give appellant "as much time as reasonably necessary to investigate" before cross-examination. Appellant objected to the ruling and asked that the motion for continuance be granted. The only ruling obtained was "objection is noted."

Deputy Stammitz testified on direct examination that he and Deputy Charles Hayhurst had taken appellant from the courtroom to the Williamson County jail for lunch on October 4, 2005.

28

At the jail, appellant's handcuffs were removed only from his right hand. His left hand remained tied to the waist restraint ("belt"). Appellant was informed that he was to eat lunch with one hand. According to Stammitz, appellant became upset and asked to see a sergeant. Stammitz said that requiring prisoners to eat with one hand was not a policy but was ordered in this situation by "someone else." Stammitz related that appellant stood there, yelling loudly that he wanted to "talk to some rank." Appellant was told twice to move into a holding cell where he was to eat lunch, but he did not move. Stammitz and Deputy Hayhurst began to forcibly take appellant into the cell. As they entered the cell, a third deputy came to assist. He either tripped or was shoved, and all went down on the holding cell floor. When Stammitz got up, he was aware of his injury, but he had felt no impact. He did not know how the injury occurred.

The next day, October 5, 2005, before the noon recess, there was a colloquy at the bench with the parties and the defense investigator. It appears that the officers' offense reports of the jail incident had been given to appellant's counsel and the videotape of the incident was to be made available. The defense investigator had apparently completed his examination of the incident. Later in the afternoon, Deputy Stammitz was cross-examined by appellant's counsel, which was generally repetitious of his earlier testimony. On redirect examination, Stammitz stated his opinion that the incident and the injury would never have occurred except for appellant's conduct in refusing to comply with the order to enter the holding cell.

Appellant did not renew his motion for continuance, ask to have the jury instructed to disregard Stammitz's testimony, or request any other relief. At no time did appellant expressly object to Stammitz's testimony about an offense or "bad act" on the grounds that proper notice of

29

the State's intention to use such extraneous evidence had not been given. In order to preserve error for appellate review, there must have been a timely, specific motion or objection with an adverse ruling obtained. Tex. R. App. P. 33.1(a)(1)(A). Appellant has failed to preserve error for review. Additionally, appellant's complaint on appeal does not comport with any complaint or objection at trial and presents nothing for review. *See Butler v. State*, 872 S.W.2d 227, 236 (Tex. Crim. App. 1994); *Rezac*, 782 S.W.2d at 870.

Appellant's reliance upon article 37.07, section 3(g) and Rule 404(b) is misplaced. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(g) (West Supp. 2008); Tex. R. App. P. 404 (b).[11]

---

[11] Article 37.07, section 3(g) provides:

(g) On timely request of the defendant, notice of intent to introduce evidence under this article shall be given *in the same manner required by Rule 404(b)*, Texas Rules of Evidence. If the attorney representing the state intends to introduce an extraneous crime or bad act that has not resulted in a final conviction in a court of record or a probated or suspended sentence, notice of that intent is reasonable only if the notice includes the date on which and the county in which the alleged crime or bad act occurred and the name of the alleged victim of the crime or bad act. The requirement under this subsection that the attorney representing the state give notice applies only if the defendant makes a timely request to the attorney representing the state for the notice.

Tex. Code Crim. Proc. Ann. art. 37.07, § 3(g) (West Supp. 2008) (emphasis added).

Rule 404(b) provides:

**(b) Other Crimes, Wrongs or Acts.** Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given *in advance of trial* of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.

Tex. R. App. P. 404(b) (emphasis added).

Article 37.07, section 3(g) provides that, "upon the timely request of the defendant," it is the State's statutory duty to give notice of its intention to introduce an extraneous crime or "bad act." The notice, if necessary, is to be given "in the same manner as required by Rule 404(b)" which means "in advance of trial."

Prior to trial, the State had given appellant notice that it intended to introduce three felony and five misdemeanor convictions as well as eight unadjudicated aggravated robbery offenses. There is no claim that the pretrial notice was inadequate. The extraneous offense or "bad act" here occurred during the time of the trial and notice could not have been given in advance of trial. The parties learned of the incident at about the same time and shortly thereafter the State gave oral notice[12] in open court of its intention to introduce evidence of the extraneous incident, giving the date, place of the occurrence, and the name of the victim. Point of error four is overruled.

### THRESHOLD ADMISSIBILITY HEARING

Appellant claims that before the trial court admitted the jail incident into evidence, it did not conduct a threshold admissibility hearing. An oral proffer by the prosecutor outlining the evidence that the State intends to offer to support the fact that a defendant committed an extraneous offense or bad act may provide a sufficient basis for the trial court's determination of admissibility. *Mitchell v. State*, 102 S.W.3d 772, 776 (Tex. App.—Austin 2003, pet. ref'd). The oral proffer here by the prosecutor was somewhat informal, but there was a lengthy colloquy at the bench, in the

---

[12] The notice need not be in writing to be considered reasonable notice. *See Blackmon v. State*, 80 S.W. 3d 103, 108 (Tex. App.—Texarkana 2002, pet. ref'd); *Chimney v. State*, 6 S.W.3d 681, 697 (Tex. App.—Waco 1999, pet. ref'd).

31

absence of the jury, about the admissibility of the evidence and the procedure to be used as a result of the circumstances. We hold that the trial court's action was sufficient under the given facts to reflect a threshold determination of the admissibility of the jail incident. As appellant acknowledges, the trial court conducted a threshold admissibility hearing on all the other extraneous offense evidence before admitting the evidence. A trial court has wide discretion in admitting evidence and the admission of evidence of an extraneous offense is reviewed under an abuse of discretion standard. *Mitchell v. State*, 931 S.W.2d 950, 953 (Tex. Crim. App. 1996).

Moreover, while appellant objected to the admission of the evidence and moved for a continuance, we find no trial objection to the lack of a hearing on the threshold admissibility of the evidence. Any error was not preserved for review. *See* Tex. R. App. P. 33.1(a)(1)(A). No error is presented and no harm analysis is necessary.[13] Point of error five is overruled.

## TAINTED IDENTIFICATION

In his sixth and last point of error, appellant complains that at the hearing on punishment, the "trial court erred in allowing the admission of an extraneous offense that was based upon a tainted identification." The extraneous offense was an aggravated robbery at the La Quinta Hotel near Highland Mall in Austin on August 16, 2004. Appellant urges that the identification of appellant by the victim of the robbery, Jessica Bahr, was tainted and was improperly admitted.

---

[13] The facts relating to the jail incident do not appear to establish an assault upon a public servant. Appellant never objected on this basis, and the jury was authorized to consider Deputy Stammitz's testimony as evidence of an extraneous bad act on appellant's part. *See Barrett v. State*, 932 S.W.2d 590, 593 (Tex. App.—Tyler 1995, pet. ref'd).

Out of the jury's presence, Austin Police Detective Andrew Perkel testified that he investigated the La Quinta robbery, talked with Bahr, got a description of the robber from her, and picked up the hotel's video of the robbery. During the investigation, Perkel took Bahr's statement, and showed her the video of the La Quinta robbery and the video of another robbery at Crossland Suites, which was a better video. When Perkel showed Bahr a photographic lineup that included appellant, Bahr was unable to identify anyone because she had only seen the suspect's "eyes." Perkel placed yellow sticky notes (Post-It notes) over the lower half of the face of each person in the lineup. Bahr was then able to identify appellant as the robber. In the jury's absence, Bahr made an identification of appellant in the courtroom and answered that she recognized him from the photo lineup because she "did not get a very good look at him while he was there." After many objections and arguments, the State decided to abandon any attempt to have Bahr make an in-court identification.

Before the jury, the State offered evidence of the extraneous offense at La Quinta Hotel that occurred on August 16, 2004, at 11:45 a.m. Bahr, an assistant manager of the hotel, testified that while looking at a monitor in the manager's office, she saw somebody jump over the counter. When she went to investigate, the man held a knife towards her and told her to open the cash drawer. She described the individual as a white male wearing baggy clothes, a T-shirt, brown work boots, and a bandana that covered his nose and mouth. Bahr retreated to the manager's office and called the police. She stated that about $150 was stolen in the robbery. At no time did Bahr make an in-court identification of appellant before the jury and made no mention of any earlier

33

photo lineup identification. Insofar as appellant claims that tainted-identification evidence was admitted before the jury at trial, he is mistaken.

During Bahr's testimony, the State introduced the video tape of the La Quinta robbery and still photographs from that video. Each time appellant expressly stated: "no objection" to the State's offer. The videotape showed a reddish-maroon older motor vehicle outside the hotel at the time of the robbery and showed the described suspect in action. When a defendant expressly states "no objection" to the introduction of evidence in the jury's presence, he waives the right to complain on appeal of the admission of that evidence into the record. *James v. State*, 772 S.W.2d 84, 97 (Tex. Crim. App. 1988).

Putting the tainted-identification claim aside, if it is appellant's claim that the State failed to prove beyond a reasonable doubt that appellant committed the extraneous robbery at the La Quinta Hotel, then he has not briefed that contention nor cited any authorities. *See* Tex. R. App. P. 38.1(h). Nothing is presented for review in this connection. The sixth point of error is overruled.[14]

The judgment is affirmed.

---

[14] We observe that the trial court carefully instructed the jury in the court's charge on punishment that the jury could not consider evidence admitted relating to an extraneous offense or bad act unless the jurors first determined beyond a reasonable doubt that appellant had committed the extraneous offense or bad act.

_____

John F. Onion, Jr., Justice

Before Chief Justice Law, Justices Henson and Onion*

Affirmed

Filed:   October 16, 2008

Do Not Publish

* Before John F. Onion, Jr., Presiding Judge (retired), Texas Court of Criminal Appeals, sitting by assignment.  *See* Tex. Gov't Code Ann. § 74.003(b) (West 2005).